UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
JEFFERSON RAMIREZ                     :

            Petitioner,              <u>REPORT & RECOMMENDATION</u>
                                     :
       -against-                     03 Civ. 1648 (LAP)(MHD)
                                     :
GEORGE DUNCAN, Superintendent, :
Great Meadow Correctional
Facility,                            :
                                     :
            Respondent.
------------------------------x

TO THE HONORABLE LORETTA A. PRESKA, U.S.D.J.:


      Petitioner Jefferson Ramirez seeks a writ of <u>habeas</u> <u>corpus</u> to
challenge his 2000 conviction in New York State Supreme Court,
Bronx County, on a single count of Murder in the Second Degree.
Petitioner is presently serving a term of twenty-five years to
life.


      In support of his petition, petitioner simply lists the issues
that he unsuccessfully raised on his direct appeal in state court.
Specifically, he claims that the prosecutor used statements
obtained from him during an unlawful arrest to convict him, in
violation of his Fourth Amendment rights, and that his sentence was
harsh and excessive. For the reasons that follow, we conclude that
petitioner's first claim is beyond the scope of habeas review, and
that his second claim is meritless.

1

PRIOR PROCEEDINGS

Petitioner's conviction stemmed from the March 22, 1999 murder of Maria Vega in her family's apartment at 1437 Shakespeare Avenue in the Bronx. On April 7, 1999, a Bronx County grand jury returned an indictment of Ramirez, charging him with Intentional Murder in the Second Degree, Murder in the Second Degree with Depraved Indifference, Manslaughter in the First Degree, and Criminal Possession of a Weapon in the Fourth Degree. (See Affidavit of Ass't Attorney General Nancy D. Killian, sworn to June 16, 2003 ("Killian Aff."), Ex. 2 at p. 1; Ex. 3 at p. 3).

Ramirez filed an omnibus pretrial motion that sought, inter alia, to suppress all the statements that he had made to the police and the District Attorney's office, claiming that the statements were involuntarily made within the meaning of N.Y. Crim. Pro. L. § 60.45. (Id., Ex. 1 at p. 1; Ex. 2 at p. 4). On September 19, 2000, the court (the Hon. Edward M. Davidowitz, Court of Claims Judge and Acting Supreme Court Justice) conducted a suppression hearing, at which three police officers testified.

Detective Modesto Acevedo testified that when he responded to the crime scene with several other detectives at approximately 3:25 p.m. on March 22, 1999, he saw Ms. Vega's body on her bedroom

floor, her chest covered in blood. (Hearings Transcript ("Hr'g. Tr.") 37a-39). Nelson Vega and Deyanira Vega, the father and sister of Maria Vega, told him that Maria had recently broken up with her boyfriend, Mr. Ramirez, and that she had been "having problems" with him since the break-up, including one instance when Ramirez warned her to "take care of herself." (Hr'g. Tr. 39-43, 51-54).

Detective Albert Rosario testified that, after arriving at the crime scene, he interviewed Gabrial Gotay, the porter at the building. (Hr'g. Tr. 5-7). Mr. Gotay stated that he had seen an Hispanic male, whom he recognized as Maria's boyfriend, standing in front of her apartment door before 10:00 that morning. (Hr'g. Tr. 8-9). When Mr. Gotay told the boyfriend that he could not remain in front of the apartment, the man responded that he was waiting for Maria to open the door. (Hr'g. Tr. 8). Mr. Gotay described the man as approximately eighteen to nineteen years old, about 5'6" tall, with a medium complexion, wearing a dark jacket and baseball cap and carrying a large umbrella. (Hr'g. Tr. 16-17).

Detective Robert Colten testified that later that day he showed Mr. Gotay a photo of Maria and Ramirez, with Maria's face covered. Gotay confirmed that Ramirez was the man who had been standing outside Maria's apartment that morning. (Hr'g. Tr. 249).

Detective Acevedo testified that he had interviewed Maria Ulloa, who was visiting her daughter's house on Shakespeare Avenue on the day of the murder. She told Detective Acevedo that at approximately 9:30 that morning she had seen from the window a female Hispanic and a male Hispanic in his early 20's, about 5'8" tall, wearing a black hat and black jacket and holding a large umbrella. (Hr'g. Tr. 47-49). The man held the woman against a fence and then walked with her in the direction of 1437 Shakespeare Avenue. (Hr'g. Tr. 48).

Detective Acevedo also recounted an interview with Thomas Iredrian, a resident of 1437 Shakespeare Avenue. He told Detective Acevedo that he had seen an Hispanic couple in their twenties enter the building and go to "the first floor apartment" at about 11:30 a.m. Mr. Iredrian described the male Hispanic as 5'7" to 5'8" tall, of medium build, with very short hair, and wearing a blue bubble jacket. (Hr'g. Tr. 62-63).

According to Detective Acevedo, Cindy Fionuta, a friend of Maria, told him that, two weeks before the murder, Maria had recounted an incident with Ramirez. As described by Mr. Fionuta, Ramirez had taken Maria "from the train station, [] to the house" and held a knife to her neck. (Hr'g. Tr. 67).

Detective Robert Colten testified that following the discovery of the body, he had gone with several other officers to Ramirez's home at 1269 Grand Concourse to look for him at 9:50 p.m. (Hr'g. Tr. 240-41). According to Detective Colten, he encountered Ramirez in the lobby, and told him that he would like to talk to him at the 44th Precinct. (Hr'g. Tr. 243-45). Ramirez cooperated calmly and went to the precinct in a police car, uncuffed. (Hr'g. Tr. 245-46, 250-52).

Detective Acevedo testified that Ramirez arrived at the precinct at approximately 10:10 p.m. He was placed in an interview room, and remained there alone, unrestrained, until about 1:30 a.m., when Detective Acevedo came in and told petitioner that he wanted to talk to him about Maria Vega's death. (Hr'g. Tr. 75-76, 81, 156-59). The detective started by asking Ramirez what he had done on the day of her death. Ramirez did not respond. Detective Acevedo then proceeded to advise Ramirez of his <u>Miranda</u> rights, to each of which Ramirez responded that he understood. (Hr'g. Tr. 77-79, 82-83, 86, 160-62, 169-70). Thereafter, Ramirez agreed to answer questions. (Hr'g. Tr. 90-91).

Officer Acevedo asked Ramirez again what he had done on the day of the murder. Ramirez did not respond verbally, but shook his head. Detective Acevedo then asked him to write his response, and

he wrote a statement about his activities on the date of Maria's murder, which did not include seeing or speaking to Maria. (Hr'g. Tr. 92-95, 161-63, 166-69). Detective Acevedo questioned Ramirez about the statement for an hour, telling him that his statement lacked credibility because he had been seen with Maria and in Maria's building that morning. (Hr'g. Tr. 97, 164-66, 171-72, 175-79).

At 3:30 a.m., Detective Acevedo completed a second written statement based on Ramirez's first statement and his answers to the detective's questions about it. In the second statement Ramirez still denied having had any contact with Maria on the day of her murder, but included more details about what he had done, whom he had been with, and the locations at which he had conducted his claimed activities. (Hr'g. Tr. 97, 173-74; Killian Aff., Ex. 3 at p. 9).

Detective Acevedo left the interview room at about 4:30 a.m. and told Ramirez that he would come back to talk to him again. (Hr'g. Tr. 107-08, 180-83). Ramirez was left alone in the interview room, still unrestrained. He was offered food and drink, used the bathroom and slept for a while. He never asked whether he could leave the precinct. (Hr'g. Tr. 107-08, 180-83, 189, 223).

At about 11:30 a.m. Ramirez walked to the door of the interview room and waved to Detective Acevedo. Detective Acevedo walked over, and Ramirez stated that he wanted to tell the detective what had actually happened. (Hr'g. Tr. 106-08, 191-92). Detective Acevedo reminded him of his Miranda rights, to which Ramirez replied that he remembered and understood them. (Hr'g. Tr. 108). Ramirez then told Detective Acevedo that he had waited for Maria at her apartment building on the morning of March 22, 1999, met her in the street as she left home, and returned with her to her apartment, where they talked and had sex. Maria laughed at him and called him a stupid person, and he reacted by stabbing her with a knife. She struggled, scratching his chest and index finger, and begged him not to kill her. They struggled from the bed to the floor, where Ramirez stabbed her to death. Afterwards he washed his hands in the bathroom, threw the knife away in a park and went home. (Hr'g. Tr. 109-10, 118-20).

Detective Acevedo recorded the statement, which was completed at 2:40 p.m., and Ramirez read and signed it. (Hr'g. Tr. 111-12; Killian Aff., Ex. 1 at p. 5). Detective Acevedo then placed Ramirez under arrest. (Hr'g. Tr. 195). At 3:30 p.m., Ramirez made a video-taped statement to an assistant district attorney, after Miranda rights had again been administered to him. (Hr'g. Tr. 122-25, 203, 206).

Ramirez did not testify or present witnesses or evidence at the suppression hearing. His attorney argued that Detective Acevedo's testimony that Ramirez had offered his confession without coercion lacked credibility. (Hr'g Tr. 259-60).

The hearing court denied Ramirez's motion to suppress. In doing so, Justice Davidowitz found that Ramirez "voluntarily went with the detectives to the precinct," and that Ramirez "always remained in a non-coercive environment."[1] (Killian Aff., Ex. 1 at p. 7).

Trial commenced on September 22, 2000 before Justice Davidowitz and a jury. Neyanira Vega, Maria's younger sister, testified that Maria had met Ramirez when she was a 17-year-old student at Health Opportunities High School, and that during the two years they dated, Neyanira spent time with the couple almost every day. (Trial Transcript ("T. Tr.") 135-38). Neyanira described Ramirez as a very jealous man, who "would get really angry" when Maria spoke to other men. (T. Tr. 142). Neyanira also testified that after Maria broke up with Ramirez in early March of 1999,

_____

[1] The hearing court orally denied Ramirez's suppression motion on September 22, 2002 and later issued a written decision dated November 30, 2000, reiterating its findings from the hearing. (See Hr'g. Tr. 269-71; Killian Aff., Ex. 1).

Ramirez left Maria a telephone message warning her to "be careful, watch your back." (T. Tr. 134-35, 149).

Gabriel Gotay, the porter of 1437 Shakespeare Avenue, also testified at trial. He recounted his encounter with Ramirez in terms that were substantially consistent with the account of Detective Rosario at the suppression hearing. (T. Tr. 181-203).

The trial testimony of Detectives Acevedo and Colten was virtually identical to their testimony at the suppression hearing. Detective Acevedo also read to the jury Ramirez's third statement, in which he confessed to the murder and admitted that during their struggle Maria had scratched his chest and index finger. (T. Tr. 289-93).

According to both petitioner and respondent, Colleen Murphy, a forensic expert from the DNA Unit of the Office of the Chief Medical Examiner of the City of New York, testified that she had conducted DNA tests on blood and semen-stained items from the crime scene, blood samples from Maria and Ramirez, clippings from Maria's finger nails, and swabs taken from Maria's anal and vaginal area. (See Killian Aff., Ex. 2 at p. 27; Ex. 3 at p. 24).[2] Ms. Murphy

---

[2] The part in the transcript containing Ms. Murphy's testimony is missing from the trial transcript submitted to us by respondent.

testified, according to both parties, that the scrapings from under Maria's fingernails could have come from Ramirez, and that the semen found on Maria belonged to Ramirez. (Id.).

On October 11, 2000 the jury acquitted Ramirez of intentional murder but convicted him on a single count of depraved-indifference murder in the second degree. (T. Tr. 924-25). On December 1, 2000, Justice Davidowitz sentenced Ramirez to a term of 25 years to life, the maximum sentence allowed under state law.

Ramirez appealed to the Appellate Division, asserting (1) that the trial court had erred in declining to suppress his confessions, because the statements directly resulted from an unlawful arrest in violation of his Fourth Amendment rights, and (2) that the 25-year-to-life sentence was harsh and excessive. (See Killian Aff., Ex. 2 at pp. 38-48). On October 22, 2002, the Appellate Division affirmed the conviction and the sentence. See People v. Ramirez, 298 A.D.2d 266, 748 N.Y.S.2d 480 (1st Dep't 2002).

Ramirez next sought leave to appeal to the New York Court of Appeals. On that application he requested permission to raise only the first claim from his direct appeal, that is, the Fourth Amendment argument. (See Killian Aff., Ex. 4). The Court of Appeals

denied leave on December 26, 2002. <u>See</u> <u>People v. Ramirez</u>, 99 N.Y.2d 563, 754 N.Y.S.2d 215 (2002).

Rebuffed by the state courts, Ramirez turned to this court, filing his habeas petition with the <u>Pro</u> <u>Se</u> clerk on March 11, 2003.

<u>ANALYSIS</u>

Petitioner advances two claims to challenge his current confinement. Neither has merit.

## I.   Fourth Amendment

Petitioner's first claim is that, contrary to the finding of the suppression hearing court, he was under illegal <u>de</u> <u>facto</u> arrest between the time he arrived at the 44th Precinct and the time he confessed. Petitioner maintains that the questioning and extracting of his statements by Detective Acevedo during that period was therefore unlawful, and that the hearing court's denial of his motion to suppress was erroneous. We cannot review this claim in view of the holding of <u>Stone v. Powell</u>, 428 U.S. 465 (1976), and its progeny.

Under <u>Stone</u>, Fourth Amendment claims are ordinarily beyond the reach of habeas review: "[W]here the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." <u>Id.</u> at 494. <u>Accord</u>, <u>Capellan v. Riley</u>, 975 F.2d 67, 69-72 (2d Cir. 1992); <u>Grey v. Hoke</u>, 933 F.2d 117, 121 (2d Cir. 1991); <u>Jackson v. Scully</u>, 781 F.2d 291, 297 (2d Cir. 1986)(citing cases). The only exception to this rule is the rare case in which a petitioner can demonstrate that the state failed to provide a corrective process, or that there has been an "unconscionable breakdown" in the otherwise available state procedures. <u>See</u>, <u>e.g.</u>, <u>Capellan</u>, 975 F.2d at 70-71; <u>Gates v. Henderson</u>, 568 F.2d 830, 840 (2d Cir. 1977)(en banc).

The Second Circuit has long held that Article 710 of the New York Criminal Procedure Law -- which provides a statutory mechanism to suppress unlawfully-obtained evidence -- constitutes a facially adequate mechanism for considering Fourth Amendment defenses in criminal proceedings. <u>See</u>, <u>e.g.</u>, <u>Capellan</u>, 975 F.2d at 70 n. 1; <u>Jackson</u>, 781 F.2d at 297; <u>McPhail v. Warden, Attica Corr. Facility</u>, 707 F.2d 67, 69 (2d Cir. 1983); <u>Gates</u>, 568 F.2d at 837. Petitioner also cannot show an "unconscionable breakdown" in this procedure, an exception that cannot be invoked simply to correct an erroneous

state-court constitutional ruling. <u>See</u>, <u>e.g.</u>, <u>Capellan</u>, 975 F.2d at 70-72; <u>Gates</u>, 568 F.2d at 840.

There is no serious dispute that petitioner was afforded a full and fair opportunity to litigate his claim in the state courts. The trial court conducted a <u>Mapp</u>/<u>Dunaway</u> hearing, at which defense counsel extensively cross-examined each of the testifying police officers and made arguments on behalf of Ramirez. (Hr'g. Tr. 10-18, 155-217, 227-30, 250-55, 259-62). The hearing court found (1) that Ramirez had gone to the precinct with the police voluntarily, (2) that he was not under arrest or in custody until he actually confessed, and (3) that in any event, "the police had, at the very least, a reasonable suspicion that the defendant had committed th[e] crime and a right, therefore, to detain him for a reasonable period of time to conduct their investigation." (Hr'g Tr. 269-70; Killian Aff., Ex. 1 at p. 7). Based on those findings, the hearing court concluded that the statements were voluntarily made and admissible at trial. (<u>See</u> <u>id.</u> 270; Killian Aff., Ex. 1 at p. 7).

Petitioner also requested appellate review of this decision by the First Department, and that court affirmed the trial court's decision, holding that, based on the hearing record, "[d]efendant's statements were not products of an illegal detention", because he

had "voluntarily accompanied the officers to the precinct" and was "free to leave" during the interrogation. See Ramirez, 298 A.D.2d at 266, 748 N.Y.S.2d at 480.

In addition, petitioner exercised his right to request leave to appeal to the New York Court of Appeals on the basis of this Fourth Amendment argument. (See Killian Aff., Ex. 4).

Under these circumstances, we conclude that petitioner had ample opportunity to litigate his Fourth Amendment claim in state court. We therefore have no authority to revisit the issue. See, e.g., Skinner v. Duncan, 2003 WL 21386032, at *14 (S.D.N.Y. June 17, 2003)(quoting Stone, 428 U.S. at 494-95)(citing cases).

Finally, we note that petitioner's Fourth Amendment claim could be viewed, under a liberal reading of his pro se pleadings, as a Fifth Amendment claim of a coerced confession. See Haines v. Kerner, 404 U.S. 519, 520-21 (1972) (instructing that pleadings of pro se litigants be liberally construed); Dorsey v. Kelly, 112 F.3d 50, 52 (2d Cir. 1997). There is, however, a fatal obstacle to this potential claim: petitioner failed to raise it on direct appeal or by collateral challenge, thus failing to exhaust state remedies

pursuant to 28 U.S.C. § 2254(b)(1).[3] <u>See</u>, <u>e.g.</u>, <u>Baldwin v. Reese</u>, 124 S.Ct. 1347, 1349 (2004); <u>Fama v. Comm'r of Corr. Servs.</u>, 235 F.3d.804, 808-09 (2d Cir. 2000); <u>Moorish Sci. Temple of Am., Inc.</u>, 693 F.2d 987, 989 (2d Cir. 1982). Thus, we cannot entertain this potential claim.

## II. Sentencing

Petitioner's remaining claim attacks his prison term of twenty-five years to life as harsh and excessive. Respondent argues that this claim is unexhausted but should be deemed exhausted and forfeited, since petitioner can no longer return to state court to litigate this claim. (Respondent's Memorandum of Law at pp. 7-13). Alternatively, respondent argues that, even assuming that petitioner's claim had been framed in Eighth Amendment terms, insofar as the sentence is within the range prescribed by state law, that sentence did not contravene the Eighth Amendment. (<u>Id.</u> at 13-15). We forgo the exhaustion issue to dispose of this claim on the merits, pursuant to 28 U.S.C. § 2254(b)(2).

---

[3] Indeed, on direct appeal, petitioner not only failed to raise a coerced-confession claim, but also effectively conceded that such a claim was unavailable to him, by arguing that "even though the defendant's Fifth Amendment rights were not violated, since his Fourth Amendment rights were, the Statements must still be suppressed." (Killian Aff., Ex. 2 at p. 39).

The length of a state defendant's sentence, if within statutory limits, is not ordinarily a matter of constitutional significance. See, e.g., White v. Keane, 969 F.2d 1381, 1383 (2d Cir. 1992). Constitutional review of state sentencing decisions is generally limited to whether the sentence exceeded the statutory maximum, see, e.g., Jones v. Thomas, 491 U.S. 376, 381 (1989); whether the sentencing court relied upon constitutionally impermissible considerations, see, e.g., Alabama v. Smith, 490 U.S. 794, 798-800 (1989); Texas v. McCullough, 475 U.S. 134, 141-44 (1986); whether it relied upon materially incorrect information, see, e.g., Townsend v. Burke, 334 U.S. 736, 741 (1948); Gayle v. Mann, 966 F.2d 81, 84 (2d Cir. 1992); and whether the sentence violated the Ex Post Facto or Double Jeopardy clauses. See, e.g., Miller v. Florida, 482 U.S. 423, 431-33 (1987); United States v. Meeks, 25 F.3d 1117, 1120 (2d Cir. 1994); Stewart v. Scully, 925 F.2d 58, 62 (2d Cir. 1991). The habeas court may also review whether a state sentence was "constitutionally disproportionate" in view of the facts of the case, but relief based on such a claim is "exceedingly rare" in non-capital cases. See, e.g., Ewing v. California, 538 U.S. 11, 21 (2003)(O'Connor, J.); Harmelin v. Michigan, 501 U.S., 957, 966 (1991)(Scalia, J.); Solem v. Helm, 463 U.S. 277, 289-90 (1983)(quoting Rummel v. Estelle, 445 U.S. 263, 272 (1980)); Bethea v. Scully, 834 F.2d 257, 261 (2d Cir.

1987)(quoting <u>United States v. Ortiz</u>, 742 F.2d 712, 714 (2d Cir. 1984)).[4]


Petitioner makes no meaningful effort to demonstrate the applicability of any of these bases for habeas review. Although he asserts that the sentence was harsh and excessive, he offers no justification for suggesting that it was so disproportionate to the crime as to raise doubts about its constitutional viability. He stabbed his victim eleven times, despite her pleas for mercy, because she had ridiculed him. (T. Tr. 292, 542). At sentencing, Ramirez's attorney pled for leniency based upon his client's age (eighteen when sentenced), lack of a criminal record, and expressions of remorse. (Sentencing Tr. 11-13). Justice Davidowitz declined to exercise leniency, stating that Ramirez's crime was "the most vicious and brutal crime that has been tried before me in my almost fifteen years as a judge," and that Ramirez's age was not a mitigating factor. (<u>Id.</u> at p. 14).


The record thus reflects ample justification for the sentence imposed, which was within statutory limits, <u>see</u> N.Y. Penal L. §§

---

[4] A habeas court may also review a state statutory sentencing scheme on a claim that "it offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." <u>Bethea</u>, 834 F.2d at 259 (quoting <u>McMillian v. Pennsylvania</u>, 477 U.S. 79, 85 (1986), and <u>Speiser v. Randall</u>, 357 U.S. 513, 523 (1958)). Petitioner does not assert such a claim here.

125.25(2)(Murder in the Second Degree is a Class A-I violent felony offense); N.Y. Penal L. §§ 70.00(2)(a), (3)(a)(i)(a defendant convicted of a class A-I felony must be sentenced to a minimum of fifteen years and a maximum of twenty-five years to life imprisonment), and no evidence whatsoever showing that the sentencing court relied upon constitutionally impermissible considerations or materially incorrect information. Petitioner's complaint about his sentence is meritless.

## CONCLUSION

For the reasons noted, we recommend that the writ be denied and the petition dismissed with prejudice.

Pursuant to Rule 72 of the Federal Rules of Civil procedure, the parties shall have (10) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies to be delivered to the chambers of the Honorable Loretta A. Preska, Room 1320, and to the chambers of the undersigned, Room 1670, 500 Pearl Street, New York, New York 10007. Failure to file timely objections may constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals. See Thomas v. Arn, 474 U.S. 140,

150 (1985); <u>Small v. Secretary of Health and Human Servs.</u>, 892 F.2d

15, 16 (2d Cir. 1989); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72,

6(a), 6(e).


**Dated:  New York, New York**
          **July 12, 2006**


                              **RESPECTFULLY SUBMITTED,**



                              _____
                              **MICHAEL H. DOLINGER**
                              **UNITED STATES MAGISTRATE JUDGE**




Copies of the foregoing Report and Recommendation have been mailed
today to:

Mr. Jefferson Ramirez
# 00-A-7145
Green Haven Correctional Facility
Route 4000
Stormville, New York 12582

<u>Pro Se</u> Staff Attorney
United States District Court
Southern District of New York
500 Pearl Street, Room 230
New York, New York 10007-1312

Diane McCullough, Esq.
Director of Habeas Litigation
Office of the Attorney General
    for the State of New York
120 Broadway
New York, New York 10271-0332

Nancy D. Killian, Esq.
Assistant District Attorney
Bronx County
Appeals Bureau
198 East 161st Street
Bronx, New York 10451